UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD NICHOLAS SPAULDING, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> ABBOTT LABORATORIES, an Illinois corporation, ) <br> and MILES D. WHITE, ) <br> ) <br> Defendants ) | 10 C 199 <br><br> Judge Feinerman |

**MEMORANDUM OPINION AND ORDER**

Ronald Nicholas Spaulding brought this diversity action against Abbott Laboratories and Miles D. White, its President and Chief Executive Officer, alleging that Defendants wrongly confiscated from Spaulding 45,167 shares of Abbott stock. Defendants move under Rule 12(b)(6) to dismiss the suit. The motion is granted in part and denied in part.

**Background**

The facts alleged in Spaulding's amended complaint are assumed true on a Rule 12(b)(6) motion. *See Reger Dev. LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010). Exhibits attached to the amended complaint may be considered on a Rule 12(b)(6) motion, *see Witzke v. Femal*, 376 F.3d 744, 749 (7th Cir. 2004), and exhibits attached to Defendants' motion to dismiss but not the amended complaint may be considered if they are "referred to" in the complaint and "central" to Spaulding's claim. *Wright v. Assoc. Ins. Cos., Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). To the extent the amended complaint's allegations diverge from the express language of the exhibits, the exhibits take precedence. *See Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007).

Spaulding became an employee and officer of Abbott on April 21, 2006. During Spaulding's two-year tenure, he and Abbott executed five restricted stock agreements, each pursuant to Abbott's 1996 Incentive Stock Program. Three of the agreements, referred to here as the Performance Restricted Agreements, granted Spaulding restricted and forfeitable Abbott shares that, upon his satisfaction of certain performance criteria, would mature into unrestricted and non-forfeitable shares. The two other agreements, referred to here as the Time Restricted Agreements, granted Spaulding restricted and forfeitable Abbott shares that would mature into unrestricted and non-forfeitable shares after three years or, alternatively, upon an "involuntary discharge other than 'for cause.'" The Performance Restricted Agreements and Time Restricted Agreements included different provisions setting forth the circumstances under which shares can be forfeited prior to a maturation event.

On April 15, 2008, Spaulding was informed by his supervisor, John Capek, "that Spaulding would have to be separated from Abbott." Days later, Abbott transferred Spaulding's supervisory duties to another Abbott employee and presented Spaulding with a copy of a "Separation Agreement" setting forth the terms of his "resignation" from Abbott. The amended complaint alleges that the term "resignation" in Separation Agreement was "understood by both Spaulding and Abbott to mean Spaulding's *involuntary* resignation because Spaulding had already been told by Capek that he was being Discharged by Abbott." On April 23, 2008, Spaulding was informed that his last day of work would be April 24, 2008.

According to Spaulding, his shares at the time of discharge fell into three categories: (a) 23,333 Performance Restricted Shares that had already matured into unrestricted and non-forfeitable shares; (b) 25,167 Performance Restricted Shares for which the performance-related criteria had not yet been satisfied, but which matured into unrestricted and non-forfeitable shares

upon his discharge; and (c) 20,000 Time Restricted Shares that matured into unrestricted and non-forfeitable shares upon his discharge. This chart summarizes Spaulding's view:

| Date of Agreement | Type of Restricted Stock Agreement | General Rule for Lapse of Restrictions | Shares Granted | Shares where restrictions lapsed before discharge date | Shares where restrictions lapsed based on discharge- Time Restricted Shares | Shares where restrictions remained on effective discharge date- Performance Restricted Shares |
|---|---|---|---|---|---|---|
| 4/21/2006 | Performance | 1/3 increments each with 2 additional years to lapse; based on Abbott Return on Equity ("ROE") | 30,000 | 20,000 | -- | 10,000 |
| 2/16/2007 | Performance | Same as 4/21/2006 agreement | 10,000 | 3,333 | -- | 6,667 |
| 2/16/2007 | Time | Restrictions completely lapse after 3 years | 15,000 | -- | 15,000 | -- |
| 9/28/2007 | Time | Same as 2/16/2007 agreement | 5,000 | -- | 5,000 | -- |
| 2/15/2008 | Performance | Same as 4/21/2006 agreement | 8,500 | -- | -- | 8,500 |
| **TOTAL** | -- | -- | 68,500 | 23,333 | 20,000 | 25,167 |

On May 8, 2008, Spaulding signed the Separation Agreement and sent Abbott two letters, which the parties call "Contemporaneous Letters," stating that Spaulding, "by signing [the Separation Agreement], does not waive any of his rights and interests pursuant to the Abbott 1996 Stock Incentive Plan, or any of the [Stock Agreements]." Abbott returned to Spaulding a
-3-

fully executed Separation Agreement on May 12, 2008, but never responded to the Contemporaneous Letters. Fourteen days later, Abbott confiscated from Spaulding's personal UBS account 45,167 Abbott shares—the 25,167 Performance Restricted Shares for which Spaulding had not satisfied all performance-related criteria, and the 20,000 Time Restricted Shares. Abbott did not confiscate the 23,333 Performance Restricted Shares that had already matured into unrestricted and non-forfeitable shares.

Spaulding filed suit on August 25, 2009. The suit's thrust is that Spaulding was involuntarily terminated without cause, and therefore that the Stock Agreements prohibited Abbott from taking the 45,167 shares. The amended complaint sets forth six counts: (1) a count seeking a declaration as to "the rights of the parties under the Restricted Stock Agreements"; (2) a common law contract count alleging that Abbott materially breached the Stock Agreements and the Separation Agreement by confiscating the shares; (3) a common law conversion count alleging that Abbott wrongfully deprived Spaulding of his rights in the confiscated shares; (4) a common law fraud count alleging that Abbott fraudulently induced him to sign the Separation Agreement; (5) a count under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq*., stated against both Abbott and White; and (6) a separate contract claim alleging that Abbott breached the Abbott Tax Equalization Program, which is described below.

**Discussion**

To survive a motion to dismiss, a complaint must overcome "two easy-to-clear hurdles": (1) "the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which it rests"; and (2) "its allegations must plausibly suggest that the plaintiff has the right to relief, rasing that possibility above a speculative level." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (internal quotations omitted).

Where the well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (internal quotations omitted).

I.  **Counts I-III (Declaratory Judgment, Contract, Conversion)**

The declaratory judgment, contract, and conversion counts all turn on whether the parties' contracts allowed Abbott to take the 45,167 Abbott shares upon Spaulding's departure from Abbott. The Stock Agreements do not have choice of law provisions, but the parties assume that Illinois law governs, so the court will as well. *See McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998). Spaulding contends that the Stock Agreements prohibited Abbott from taking the shares because his termination was involuntary and without cause. Abbott counters that Spaulding's termination was voluntary, and therefore that the Stock Agreements permitted Abbott's action.

The parties' disagreement over the nature of Spaulding's termination is immaterial to the Performance Restricted Shares because the Performance Restricted Agreements allowed Abbott to take those shares even if, as Spaulding alleges, he was involuntarily terminated without cause. The forfeiture provision of those Agreements states in pertinent part:

> In the event of termination of the Employee's employment with the Company, other than under the circumstances described in Section 4 or Section 5 above, (including without limitation due to the Employee's voluntary resignation (other than due to retirement) or involuntary discharge for cause), all of the Units with respect to which the Restriction has not lapsed shall be forfeited by the Employee … <u>provided</u>, <u>however</u>, that in the event that the Employee is involuntarily discharged by the Company or its subsidiaries other than for cause, the Company shall have the authority (but not the obligation) to act, in its sole discretion, to accelerate the lapse of Restriction set forth in Section 3 above and to cause any Units that have not previously been paid out … to be settled in the form of Company common stock on the date of such involuntary discharge.

The provision is unambiguous—the "termination" of Spaulding's employment results in the forfeiture of unmatured Performance Restricted Shares, unless the termination occurs under circumstances described in Sections 4 or 5 (retirement, disability, or death), or unless Abbott, upon an involuntary termination without cause, exercises its "sole discretion" to forego forfeiture.

Spaulding does not allege that the termination occurred pursuant to Sections 4 or 5 or that Abbott exercised its discretion to forego forfeiture. He contends, however, that the word "termination" in the first line of the forfeiture provision is limited to the two circumstances set forth in the "including without limitation" parenthetical—"voluntary resignations (other than due to retirement)" and "involuntary discharges for cause"—and does not include involuntary terminations without cause. Spaulding reads too much into the parenthetical, which simply highlights two examples of forfeiture-inducing terminations without purporting to cover the field. *See Capocy v. Kirtadze*, 183 F.3d 629, 634 (7th Cir. 1999) (holding that term "including without limitation" indicates that the list is only "part of the world" of triggering events); *Enis v. Cont'l Ill. Nat'l Bank & Trust Co. of Ill.*, 795 F.2d 39, 42 (7th Cir. 1986) (language preceding the words "include" or "such as" "cannot sensibly be limited to the instances given"); *Puerto Rico Mar. Shipping Auth. v. I.C.C.*, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981) ("It is hornbook law that the use of the word including indicates that the specified list … is illustrative, not exclusive."); *Murata Mfg. Co., Ltd., v. Bel Fuse, Inc.*, 242 F.R.D. 470, 479 (N.D. Ill. 2007) (same); *People v. Perry*, 864 N.E.2d 196, 208-09 (Ill. 2007) (same). Thus, even accepting Spaulding's view that his departure from Abbott was involuntary and without cause, his discharge indisputably was a "termination" within the meaning of the forfeiture provision of the Performance Restricted Agreements.

The point is confirmed by the "provided, however" proviso appearing at the end of the forfeiture provision, which gave Abbott the "sole discretion" to forego forfeiture of non-matured Performance Restricted Shares upon an involuntary discharge without cause. If an involuntary discharge without cause was not a "termination," then the shares would not have been forfeited upon such a discharge, and there would have been no point to including a proviso granting Abbott the discretion to forego forfeiture under those circumstances. Settled principles of Illinois contract law preclude interpreting the contract in this manner. *See Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1105 (7th Cir. 1997) ("We must, of course, interpret a contract as a whole, and we must try to give meaning and effect to each provision in the contract."); *Snelten v. Schmidt Implement Co.*, 647 N.E.2d 1071, 1074 (Ill. App. 1995) ("It is presumed contracting parties intend all portions of their contract to carry meaning and no portion was meant to be mere surplusage.").

Accordingly, the forfeiture provision of the Performance Restricted Agreement covers involuntary terminations without cause. Because Spaulding was terminated before the 25,167 Performance Restricted Shares matured into unrestricted and non-forfeitable shares, Abbott was contractually entitled to forfeit those shares, even assuming Spaulding is right that his termination was involuntary and without cause.

A different result obtains for the 20,000 Time Restricted Shares. Spaulding was at Abbott for less than three years, so those shares did not mature into unrestricted and non-forfeitable shares due to the passage of time. But another provision of the Time Restricted Agreements states that the Time Restricted Shares mature in the event of an "involuntary discharge other than 'for cause.'" Defendants contend that this provision does not apply because Spaulding's departure from Abbott was voluntary; in support, they cite language in the

Separation Agreement stating that Spaulding would "hereby tender [his] resignation … effective April 30, 2008." But the Separation Agreement does not expressly say that Spaulding's resignation was *voluntary*. And the amended complaint alleges that the word "resignation" in the Separation Agreement "was understood by both Spaulding and Abbott to mean Spaulding's *involuntary* resignation because Spaulding had already been told by Capek that he was being Discharged by Abbott."

At this stage of the proceedings, the court accepts Spaulding's allegation as true. In fact, given settled principles of Illinois law, the court would have accepted that allegation as true even if the Separation Agreement had expressly provided that the resignation was voluntary:

> So long as the employer's message that the employee has been involuntarily terminated is clearly and unequivocally communicated to the employee, there has been an actual discharge, regardless of the form such discharge takes. That defendant directed plaintiff to sign a "Voluntary Resignation" form … does not alter the allegation that plaintiff was involuntarily discharged.

*Hinthorn v. Roland's of Bloomington, Inc.*, 519 N.E.2d 909, 912 (Ill. 1988). Because Spaulding plausibly alleged that his departure was involuntary—an allegation that the facts, when they are developed in discovery, will confirm or undermine—he has stated a claim that Abbott breached the Time Restricted Agreement when it confiscated the Time Restricted Shares.

Defendants have another arrow in their quiver, arguing the Separation Agreement released any claim Spaulding might have for breach of the Stock Agreements. The release provision of the Separation Agreement states in pertinent part:

> Except to the extent limited by subparagraph 9c and *except for claims, demands, and causes of action ("Claims") for the nonperformance of this Agreement*, you hereby forever waive, release and discharge Abbott and the officers, directors, employees and shareholders of Abbott from liability … [for] any and all Claims whatsoever, whether known or unknown, related to your employment by Abbott or your termination of employment … .

By its terms, the release excludes any claims Spaulding might have for Abbott's nonperformance of the Separation Agreement. Sections 2a through 2g of the Separation Agreement provide that Abbott would pay Spaulding a lump sum of over $1 million and continue to extend certain employee benefits. Section 2i, in turn, states that "[n]o other payments or benefits will be made other than those described in subparagraphs 2a through 2i, *except as required by applicable Abbott plans and programs*" (emphasis added). Thus, Abbott would violate Section 2i of the Separation Agreement by failing to pay benefits required by its "applicable plans and programs," and such violation, being a breach of the Separation Agreement, would fall outside the scope of the release. *See Farm Credit Bank v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991) (scope of release governed by ordinary principles of contract law).

The question becomes, then, whether the Time Restricted Agreements are "applicable Abbott plans and programs." The answer unequivocally is Yes. As Abbott admits (Doc. 40 at 2), the Time Restricted Agreements provide in their first paragraph that Abbott granted Spaulding the Time Restricted Shares "under the Company's 1996 Incentive Stock *Program* (the '*Plan*')" (emphasis added). It necessarily follows that the Time Restricted Shares were granted pursuant to an "applicable Abbott plan[] and program[]," that a breach of the Time Restricted Agreements is a breach of Section 2i of the Separation Agreement, and therefore that Spaulding did not release any claims against Abbott arising from the confiscation of those shares. *See Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009) (court "must not interpret contractual language in a way contrary to the plain, obvious and generally accepted meaning of its terms").

To summarize, Counts I-III are dismissed with prejudice insofar as they pertain to the Performance Restricted Shares, but may proceed insofar as they pertain to the Time Restricted Shares.

## II.     Count V (Illinois Wage Protection & Collection Act)

The Illinois Wage Protection and Collection Act, 820 ILCS 115/1 *et seq.*, requires employers to pay "final compensation" to former employees. 820 ILCS 115/5. The term "final compensation" is defined as compensation "owed by the employer pursuant to an employment contract or agreement between 2 parties," 820 ILCS 115/2, and includes the grant of restricted stock. *See Kim v. Citigroup, Inc.*, 856 N.E.2d 639, 646 (Ill. App. 2006). The Wage Act "does not confer any rights to recovery of final compensation in the absence of a contractual right." *Byker v. Sequent Computer Sys., Inc.*, 1997 WL 639045, at *7 (N.D. Ill. Oct. 1, 1997). Because Spaulding indisputably has no contractual right to the Performance Restricted Shares, but has stated a contract claim regarding the Time Restricted Shares, Spaulding's Wage Act claim is dismissed as to the former but may proceed as to the latter. *See In re Comdisco, Inc.*, 2003 WL 685645, at *3 (N.D. Ill. Feb. 27, 2003) (Wage Act "merely requires that the employer honor his contract [and] does not confer rights in [its] absence"); *Tatom v. Ameritech Corp.*, 2000 WL 1648931, at *9 (N.D. Ill. Sept. 28, 2000) (rejecting Wage Act claim where former employee had no contractual right to stock options).

Defendants contend that Spaulding may not invoke the Wage Act because he is a Florida resident and the Act protects only "employees in this State [Illinois]." 820 ILCS 115/1. The contention fails at this stage of the case. The amended complaint alleges that Spaulding "performed work on [Abbott's] behalf in Illinois," an allegation assumed true on a Rule 12(b)(6) motion. Because "the Wage Act protects an employee who performs work in Illinois for an

Illinois employer, even if he resides in another state," Spaulding's allegation save his Wage Act claim from dismissal. *Adams v. Catrambone*, 359 F.3d 858, 863 (7th Cir. 2004); *see also Vendetti v. Compass Envt'l, Inc.*, 2006 WL 3694852, at *1 (N.D. Ill. Dec. 14, 2006) (Wage Act applies "where an employee has done at least some work for an Illinois employer while physically present in the state of Illinois"); *compare Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998) (Wage Act claim dismissed where plaintiff did not "perform any work in Illinois"). If the facts adduced in discovery indisputably show that Spaulding did not perform sufficient work in Illinois to warrant coverage under the Wage Act, Abbott may raise this argument on summary judgment.

Finally, Defendants contend that the amended complaint fails to state a Wage Act claim against White individually. The Wage Act provides that "[a]ny officers of a corporation or agents of an employer who *knowingly permit* such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13 (emphasis added); *see also Covinsky v. Hannah Marine Corp.*, 903 N.E.2d 422, 430 (Ill. App. 2009). To incur individual liability under the Wage Act, and officer must "(I) have knowledge of the compensation arrangement between the departing executive and the employer and (ii) knowingly permit the corporation to wrongfully deny some amount of compensation by participating in the decision to do so." Richard L. Miller, II, & John Haarlow, Jr., *Departing Executives and the Wage Payment Act*, 96 Ill. B.J. 138, 142 (2008) (surveying Illinois case law).

The amended complaint does not come close to alleging facts that, if proven, would allow Spaulding to recover against White individually. It alleges only that "White is Abbott's President and Chief Executive Officer, and therefore, the individual ultimately responsible for Spaulding's compensation," that White signed the Stock Agreements on Abbott's behalf, and

that White was "legally responsible" for paying wages and compensation required by the Wage Act. If Abbott were a small operation, those allegations, if proven, might plausibly show that White knowingly permitted and participated in Abbott's decision to wrongfully confiscate the Time Restricted Shares. *Cf. Stafford v. Puro*, 63 F.3d 1436, 1441 (7th Cir. 1995) ("Although [individual defendant] testified that he had no idea how [the company] compensated [plaintiff], the jury could reasonably have given this statement little credence based on [plaintiff's] testimony that he originally reported to [individual defendant] and the uncontroverted evidence that [individual defendant] routinely signed [plaintiff's] paychecks and knew he received a commission."). But Abbott is a very large company, and by telling us that Spaulding's supervisor was John Capek, the amended complaint makes clear that White was not Spaulding's direct supervisor.

In *Ashcroft v. Iqbal*, *supra*, the Supreme Court held that claims were not adequately pleaded against a high-ranking official of a large organization where the plaintiff alleged in a conclusory fashion that the official "knew of, condoned, and willfully and maliciously agreed to subject [the plaintiff] to harsh conditions of confinement" and was the "principal architect" of the policy responsible for the plaintiff's alleged harms. 129 S. Ct. at 1951. Here, Spaulding does not make even a conclusory allegation that White participated in and knowingly permitted Abbott's decision to take the Time Restricted Shares. Spaulding thus has failed to properly plead a Wage Act claim against White personally. *See Bohr v. Corrigan Moving Sys.*, 2009 WL 3517748, at *1-2 (N.D. Ill. Oct. 29, 2009) (granting dismissal where plaintiff named individual defendant based solely on his managerial position); *Corso v. Suburban Bank & Trust*, 2006 WL 418655, at *7-8 (N.D. Ill. Feb. 16, 2006) (to be individually liable under Wage Act, corporate officers, including the chairperson of the board, must be involved in the actual decision to deny

compensation); *compare Stafford*, 63 F.3d at 1440-41 (Wage Act claim permitted where individual defendant received information from plaintiff and personally inquired about compensation that continued to go unpaid); *Barner v. City of Harvey*, 1996 WL 199745, at *10-11 (N.D. Ill. Apr. 23, 1996) (dismissal denied where complaint alleged that individual defendants affirmatively "refused" to pay wages, giving "rise to the inference that Defendants consciously and intentionally chose not to pay Plaintiffs' benefits").

For these reasons, Spaulding's Wage Act claim against White is dismissed without prejudice. Spaulding may attempt to replead the claim against White. *See Bohr*, 2009 WL 3517748 at *2 (allowing plaintiff to cure defects in pleading Wage Act claim against individual). In deciding whether to expend the time and effort necessary to do so, Spaulding might bear in mind that Abbott is a going concern and that the Wage Act permits an employee only one recovery for any given injury. *See Catania v. Local 4250/5050 of Commc'ns Workers of Am.*, 834 N.E.2d 966, 975 (Ill. App. 2005).

### III. Count IV (Common Law Fraud)

Spaulding's common law fraud claim alleges that Abbott engaged in a "scheme to defraud Spaulding by inducing him to sign the Separation Agreement." The alleged fraudulent inducement proceeded as follows. When signing the Separation Agreement, Spaulding sent Abbott the Contemporaneous Letters, which informed Abbott that he was "not waiv[ing] any of his rights and interests pursuant to the Abbott 1996 Stock Incentive Plan, or any of the [Stock Agreements]." Abbott failed to respond to the Contemporaneous Letters or to inform Spaulding that it planned to confiscate the 25,167 Performance Restricted Shares and 20,000 Time Restricted Shares. That failure, Spaulding claims, violated Abbott's duty to disclose its plans to Spaulding, who relied on Abbott's silence when signing the Separation Agreement.

As Abbott correctly notes, Spaulding's fraudulent inducement claim rests on the premise that Illinois law imposed upon Abbott a duty, during an arms-length negotiation where Spaulding was represented by counsel, to disclose its interpretation of the parties' contracts. That premise is incorrect. A duty to speak arises only where there is a special or fiduciary relationship between the parties. *See Orlak v. Loyola Univ. Health Sys.*, 885 N.E.2d 999, 1010-12 (Ill. 2007); *Weidner v. Karlin*, 932 N.E.2d 602, 605 (Ill. App. 2010); *Doe v. Brouillette*, 906 N.E.2d 105, 123-24 (Ill. App. 2009). It is the plaintiff's obligation to allege the existence of a fiduciary relationship. *Rowell v. Franconia Mineral Corp.*, 582 F. Supp. 2d 1031, 1038 (N.D. Ill. 2008). Absent that allegation, a fraud claim must be dismissed. *Ibid*.

Spaulding has alleged only that "Abbott, as Spaulding's employer, was in a position of superiority over Spaulding," not that Abbott was his fiduciary. Any such allegation would be implausible given Spaulding's status as an officer and the parties' counseled negotiations regarding his departure from Abbott. *See Razdan v. Gen. Motors Corp.*, 979 F. Supp. 755, 758 (N.D. Ill. 1997) (rejecting contention that employer was employee's fiduciary where employee was "a highly educated professional with significant business experience" and "negotiated the terms of his employment contract before taking the job"), *aff'd*, 2000 WL 1205990 (7th Cir. Aug. 18, 2000) (unpublished). The Separation Agreement was nothing more, nothing less, than the product of "a typical arms' length business relationship [where] … there is no duty of disclosure." 26 Williston on Contracts § 69:23 (4th ed. 2010). While a duty to disclose might conceivably arise in some instances, this case is not among them. If parties had a duty to disclose their respective interpretations of a contract during negotiation or prior to execution, every breach of contract lawsuit—at least those turning on disputes over the contract's meaning—would be a fraud lawsuit as well, as the plaintiff could charge that the defendant

failed to reveal its interpretation of the disputed provision and that the plaintiff would not have executed the contract had it only known the defendant's interpretation. *See generally Desnick v. American Broadcasting Cos., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995) (noting that Illinois law cautions against "turning every breach of contract suit into a fraud suit").

Spaulding retorts that even if Abbott owed Spaulding no duty to disclose as a fiduciary, Abbott did not have "license to lie when asked point blank about" its interpretation of the parties' contracts. *Equity Capital Corp. v. Kreider Transp. Serv., Inc.*, 967 F.2d 249, 253 (7th Cir. 1992). The trouble with Spaulding's argument is that Abbott did no such thing. The Contemporaneous Letters simply offered Spaulding's interpretation of the Separation Agreement; they did not ask Abbott to reveal its own interpretation. *See Cleaveland v. Richardson*, 132 U.S. 318, 330 (1889) ("If either party desires information from the other, he must ask for it."). Thus, even if Illinois law would have required Abbott to disclose its interpretation of the Separation Agreement upon an explicit request from Spaulding, no such request was made.

For these reasons, Count IV is dismissed with prejudice. While Spaulding may be disappointed that Abbott did not tell him that it disagreed with his interpretation of the Separation Agreement, Abbott had no obligation to do so. And while it turns out that Spaulding's interpretation is correct—as explained above, the Separation Agreement does not release claims arising from Abbott's alleged violation of the Stock Agreements—the appropriate vehicle to resolve disputes over a contract's meaning is a contract claim, not a fraud claim. *See generally Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 261-63 (7th Cir. 1998).

## IV. Count VI (Breach of Contract/Tax Equalization Program)

Spaulding alleges that Abbott breached its obligations under the Tax Equalization Program ("TEP"), which was designed to ensure that an employee's tax burden while on global assignment would be approximately the same had the employee stayed in the United States. Abbott communicated the TEP to its employees through its Global Assignment Handbook. Spaulding alleges that Abbott breached the TEP by incorrectly designating legal residence for tax purposes, which caused him to pay excess taxes for the time he was posted to Belgium.

Illinois allows contracts to arise out of an employee handbook, *see Duldulao v. St. Mary of Nazareth Hosp.*, 505 N.E.2d 314, 318 (Ill. 1987), but not where the handbook expressly and conspicuously disclaims the creation of contractual obligations. *See Garcia v. Kankakee County Hous. Auth.*, 279 F.3d 532, 536 (7th Cir. 2002); *Davis v. Time Mirror Magazines, Inc.*, 697 N.E.2d 380, 387-88 (Ill. App. 1998). Abbott's Global Assignment Handbook contains a prominent disclaimer, in a set-off paragraph on its second page, which reads:

> The Handbook does not constitute a contract of employment or an offer of a contract of employment. Abbott assumes no contractual liability hereunder and may withhold any assistance, or offer part but not all of the assistance described herein. The entire Handbook may be amended, modified in part, or terminated by the Company at any time without notice.

This broad disclaimer is clear and conspicuous enough to defeat any notion that the handbook, and thus the TEP, creates contractual rights or obligations. *See Garcia*, 279 F.3d at 535-36 (rejecting contract claim where disclaimer on second page of handbook stated: "This Manual creates no rights, contractual or otherwise, between the Authority, any prospective or current employee, or any other person … . The Authority reserves the right to amend, modify and/or revoke any of its policies, practices, procedures and standards summarized in this handbook."); *compare Fitch v. Cont'l Cas. Co.*, 2002 WL 31834877, at *8 (N.D. Ill. Dec. 16, 2002) (employee

handbook created contractual obligations where the "hardly conspicuous" disclaimer was written in small print, located on a blank page, and situated at the end of the handbook).  Accordingly, Count VI is dismissed with prejudice.

## Conclusion

Defendants' motion to dismiss is granted in part and denied in part.  Counts I-III and V are dismissed with prejudice to the extent they concern the Performance Restricted Shares, but may proceed to the extent they concern the Time Restricted Shares.  The claim against White in Count V is dismissed without prejudice, with leave to replead within fourteen days.  Counts IV and VI are dismissed with prejudice.

November 22, 2010

_____
United States District Judge